1              HON. BENJAMIN H. SETTLE

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
9                           AT TACOMA

10   PUGET SOUNDKEEPER ALLIANCE,
                                              Case No. 11-5811BHS
11              Plaintiff,
                                              **CONSENT DECREE**
12        v.

13   TRIDENT SEAFOODS CORPORATION,

14              Defendant.

15

16                    I.     **STIPULATIONS**

17        Plaintiff Puget Soundkeeper Alliance ("Soundkeeper") sent a sixty day notice of intent to

18   sue letter to defendant Trident Seafoods Corporation ("Trident") on July 27, 2011, alleging

19   violations of the Clean Water Act, 33 U.S.C. § 1251 et seq., relating to discharges of stormwater

20   from Trident's facility in Tacoma, Washington and seeking declaratory and injunctive relief, civil

21   penalties and attorneys fees and costs.

22        Trident denies any fault, wrongdoing, or liability regarding all claims and alleged

23   violations.

24        Since the initiation of this action, Trident has made substantial improvements in the

25   control of stormwater discharges including a detailed formal assessment of potential contaminant

26   sources, the elimination of many of these sources, greatly improved implementation of source

CONSENT DECREE: No. 11-5811BHS
p. 1

1  control best management practices, and the installation of advanced stormwater treatment best

2  management practices.

3       Soundkeeper and Trident agree that settlement of these matters is in the best interest of the

4  parties and the public, and that entry of this Consent Decree is the most appropriate means of

5  resolving this action.

6       Soundkeeper and Trident stipulate to the entry of this Consent Decree without trial,

7  adjudication, or admission of any issues of fact or law regarding Soundkeeper's claims or

8  allegations set forth in its complaint and its sixty-day notice.

9       DATED this 29th day of _____October_____, 2012

10

11  CASCADIA LAW GROUP         SMITH & LOWNEY PLLC

12

13  By s/Stephen J. Tan         By s/Richard A. Smith
   Stephen J. Tan, WSBA #22756    Richard A. Smith, WSBA #21788
   Attorneys for Defendant       Attorneys for Plaintiff Puget Soundkeeper

14  Trident Seafoods Corporation

15  TRIDENT SEAFOODS CORPORATION   PUGET SOUNDKEEPER ALLIANCE

16

17  By _____  By _____
                        Chris Wilke

18  Title: _____  Puget Soundkeeper and Executive Director

19            II.    ORDER AND DECREE

20       THIS MATTER came before the Court upon the foregoing Stipulations of the parties.

21  Having considered the Stipulations and the promises set forth below, the Court hereby ORDERS,

22  ADJUDGES, and DECREES as follows:

23       1.    This court has jurisdiction over the parties and subject matter of this action.

24       2.    Each signatory for the parties certifies for that party that he or she is authorized to

25  enter into the agreements set forth below.

26       3.    This Consent Decree applies to and binds the parties and their successors and

CONSENT DECREE: No. 11-5811BHS
p. 2

SMITH & LOWNEY, P.L.L.C.
3317 EAST JOHN ST.
SEATTLE, WASHINGTON 98112
(206) 860-2883

assigns.

4.      This Consent Decree applies to the operation by Defendant Trident Seafoods Corporation ("Trident") of its Facility at 401 Alexander Ave., Tacoma, Washington 98422 (the "*Facility*").

5.      This Consent Decree is a full and complete settlement of the claims in the complaint and all other claims known and unknown existing as of the date of entry of this Consent Decree, that could be asserted under the Clean Water Act, 33 U.S.C. §§ 1251-1387, arising from operations of the Facility. These claims are released and dismissed with prejudice. Enforcement of this decree is Soundkeeper's exclusive remedy for any violation of its terms. Furthermore, Soundkeeper waives all Clean Water Act claims stemming from exceedences of NPDES permit benchmark that may occur before December 31, 2012.

6.      This Consent Decree is a settlement of disputed facts and law. It is not an admission or adjudication regarding any allegations by Soundkeeper in this case or of any fact or conclusion of law related to those allegations. It is not evidence of any wrongdoing or misconduct on the part of Trident.

7.      Trident agrees to the following terms and conditions in full and complete satisfaction of the claims covered by this decree:

a.      Trident will comply fully with conditions S3, S4, S7, S8, S9, and S10 of its National Pollutant Discharge Elimination System Permit No. WAR002508 (the "*NPDES permit*") and comparable provisions of any successor, modified, or replacement permit.;

b.      Not later than fourteen days after the date of entry of this Consent Decree, Trident will amend its Storm Water Pollution Prevention Plan ("SWPPP") to include identification of the potential pollutant sources listed in Attachment A to this Decree, as well as the source control best management practices selected to address them, which will be implemented immediately, and an updated facility map showing drainage structures and other features related to these outfalls as required by the NPDES permit.

CONSENT DECREE: No. 11-5811BHS
p. 3

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN ST.
SEATTLE, WASHINGTON 98112
(206) 860-2883

c.      Not later than September 30, 2012, Trident will install and have fully operational a stormwater treatment system as described in the engineering report that is Attachment B to this Decree, as may be modified based on the results of the Department of Ecology's review of the report.  By this date, Trident will also amend its SWPPP to include a description of the treatment system and an operations and maintenance manual for it.  Not later than two weeks after completing the SWPPP amendments required by this subparagraph and subparagraph 7.b., Trident will forward to Soundkeeper a copy of its complete SWPPP.

d.      Around the dates of the first and second anniversaries of the Court's entry of this Decree, Trident will permit Soundkeeper's stormwater expert reasonable access to the facility to inspect the implementation of stormwater best management practices and other actions required by this Decree.  If Soundkeeper's stormwater expert identifies reasonable improvements in best management practices that he believes Trident should implement, Trident will implement these improvements at the earliest practicable time and provide access for a follow-up inspection by Soundkeeper's stormwater expert to verify and review implementation.  If Trident considers such identified improvements to be unreasonable or otherwise objectionable, the parties will confer and attempt to resolve any disagreement, using the dispute resolution procedure described in paragraph 11 of this Decree.  Trident will pay all reasonable fees and costs for Soundkeeper's stormwater expert's efforts under this subparagraph, including those associated with dispute resolution.

e.      Trident will forward copies of all written or electronic communications between it and the Department of Ecology concerning compliance at the Facility with the NPDES permit, including but not limited to discharge monitoring reports, to Soundkeeper on or before the NPDES permit's quarterly due dates for discharge monitoring reports. This obligation will continue through the termination date of this Consent Decree.

CONSENT DECREE: No. 11-5811BHS
p. 4

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN ST.
SEATTLE, WASHINGTON 98112
(206) 860-2883

8. Not later than 30 days after the entry of this Consent Decree, Trident will pay one hundred and ten thousand dollars ($110,000) to the Rose Foundation for Communities and the Environment for projects to improve the water quality of Puget Sound as described in Attachment C to this Consent Decree. Checks shall be made to the order of and delivered to: The Rose Foundation for Communities and the Environment, Attention: Tim Little, 6008 College Avenue, Suite 10, Oakland, California 94618. Payment shall include the following reference in a cover letter or on the check: "Consent Decree, Puget Soundkeeper Alliance v. Trident Seafoods Corporation." A copy of the check and cover letter, if any, shall be sent simultaneously to Soundkeeper

9. Trident will pay Soundkeeper's reasonable attorney and expert fees and costs in the amount of seventy five thousand dollars ($75,000). Payment will be made within 30 days of the entry of this decree by check payable and mailed to Smith & Lowney, PLLC, 2317 East John St., Seattle, WA 98112, attn: Richard A. Smith. This payment is full and complete satisfaction of any claims Soundkeeper may have under the Clean Water Act for fees and costs.

10. A force majeure event is any event outside the reasonable control of Trident that causes a delay in performing tasks required by this decree that cannot be cured by due diligence. Delay in performance of a task required by this decree caused by a force majeure event is not a failure to comply with the terms of this decree, provided that Trident notifies Soundkeeper of the event; the steps that Trident will take to perform the task; the projected time that will be needed to complete the task; and the measures that have been taken or will be taken to prevent or minimize any impacts to stormwater quality resulting from delay in completing the task.

Trident will notify Soundkeeper of the occurrence of a force majeure event as soon as reasonably possible but, in any case, no later than fifteen days after the occurrence of the event. In such event, the time for performance of the task will be extended for a reasonable period of time following the force majeure event.

By way of example and not limitation, force majeure events include

CONSENT DECREE: No. 11-5811BHS
p. 5

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN ST.
SEATTLE, WASHINGTON 98112
(206) 860-2883

a.     Acts of God, war, insurrection, or civil disturbance;

b.     Earthquakes, landslides, fire, floods;

c.     Actions or inactions of third parties over which defendant has no control;

d.     Unusually adverse weather conditions;

e.     Restraint by court order or order of public authority;

f.     Strikes; and

g.     Litigation, arbitration, or mediation that causes delay.

11.     This Court retains jurisdiction over this matter. And, while this Decree remains in force, this case may be reopened without filing fee so that the parties may apply to the Court for any further order that may be necessary to enforce compliance with this decree or to resolve any dispute regarding the terms or conditions of this Decree. In the event of a dispute regarding implementation of, or compliance with, this Decree, the parties must first attempt to resolve the dispute by meeting to discuss the dispute and any suggested measures for resolving the dispute. Such a meeting should be held as soon as practical but must be held within 30 days after notice of a request for such a meeting to the other party and its counsel of record. If no resolution is reached at that meeting either party may file a motion with this court to resolve the dispute.

12.     The parties recognize that, pursuant to 33 U.S.C. § 1365(c)(3), no consent judgment can be entered in a Clean Water Act suit in which the United States is not a party prior to 45 days following the receipt of a copy of the proposed consent judgment by the U.S. Attorney General and the Administrator of the U.S. EPA. Therefore, upon the filing of this Consent Decree by the parties, Soundkeeper shall serve copies of it upon the Administration of the U.S. EPA and the Attorney General.

13.     This Consent Decree takes effect upon entry by the court. It terminates three years after that date, or 90 days after the parties' completion of all obligations imposed by this Decree, whichever is later. If either party believes that all obligations imposed by this Decree have not been completed, that party must so notify the other party in writing no later than the date that is

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN ST.
SEATTLE, WASHINGTON 98112
(206) 860-2883

three years after the Decree's entry by the Court. The party receiving such notice may dispute it in accordance with the provisions of paragraph 11 of this Decree. If no such notice is given the Consent Decree terminates automatically on the date that is three years after the Decree's entry by the Court.

14.    Both parties have participated in drafting this decree.

15.    This Consent Decree may be modified only upon the approval of the court.

16.    If for any reason the court should decline to approve this Consent Decree in the form presented, this Consent Decree is voidable at the discretion of either party. The parties agree to continue negotiations in good faith in an attempt to cure any objection raised by the court to entry of this Consent Decree.

17.    Notifications required by this Consent Decree must be in writing. The sending party may use any of the following methods of delivery: (1) personal delivery; (2) registered or certified mail, in each case return receipt requested and postage prepaid; (3) a nationally recognized overnight courier, with all fees prepaid; or (4) e-mail. For a notice or other communication regarding this decree to be valid, it must be delivered to the receiving party at the one or more addresses listed below or to any other address designated by the receiving party in a notice in accordance with this paragraph 17.

**if to Soundkeeper:**

Puget Soundkeeper Alliance
5305 Shilshole Ave. NW, Ste. 150
Seattle, WA 98107
chris@pugetsoundkeeper.org
katelyn@pugetsoundkeeper.org

**and to:**

Richard A. Smith
Smith & Lowney PLLC
2317 East John St.

CONSENT DECREE: No. 11-5811BHS
p. 7

Seattle, WA  98112
email: rasmithwa@igc.org

**if to Trident:**

Joe Plesha
Chief Legal Officer
Trident Seafoods Corporation
5303 Shilshole Ave. NW
Seattle, Washington  98107-4000
jplesha@tridentseafoods.com

**and to:**

Stephen Tan
Cascadia Law Group
1201 Third Ave., Suite 320
Seattle, Washington  98101
stan@cascadialaw.com

A notice or other communication regarding this Consent Decree will be effective when received unless the notice or other communication is received after 5:00 p.m. on a business day, or on a day that is not a business day, then the notice will be deemed received at 9:00 a.m. on the next business day.  A notice or other communication will be deemed to have been received: (a) if it is delivered in person or sent by registered or certified mail or by nationally recognized overnight courier, upon receipt as indicated by the date on the signed receipt; or (b) if the receiving party rejects or otherwise refuses to accept it, or if it cannot be delivered because of a change in address for which no notice was given, then upon that rejection, refusal, or inability to deliver; or (c) for notice provided via e-mail, upon receipt of a response by the party providing notice or other communication regarding this Consent Decree.

18.    Upon entry of this Decree, Soundkeeper will dismiss its appeal of Department of Ecology Administrative Order No. 8762, PCHB No. 11 – 145.

CONSENT DECREE: No. 11-5811BHS
p. 8

1

DATED this __ day of _____, 201__

2

3

4

_____

HON. BENJAMIN H. SETTLE

5

UNITED STATES DISTRICT JUDGE

6

Presented by:

7

CASCADIA LAW GROUP                    SMITH & LOWNEY PLLC

8

9

By s/Stephen Tan                      By s/Richard A. Smith

10

Stephen Tan, WSBA #22756              Richard A. Smith, WSBA #21788

Attorneys for Defendant               Attorneys for Plaintiff

11

Trident Seafoods Corporation          Puget Soundkeeper Alliance

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Attachment A**

| | Description of Potential Pollutant Source | Corrective Action |
|---|---|---|
| 1 | Galvanized slotted trench drain | Continue to clean out trench drain and associated piping annually. |
| 2 | Hossler truck with lube oil on coupler | Park truck under cover when not in use. |
| 3 | Minor oil staining on pavement | Track down leaks on trucks or other equipment used in loading dock area, quickly make repairs and cleanup drips. |
| 4 | Metal dust at recycling dumpster | Sweep up metal dust daily. |
| 5 | Ferrous and non-ferrous metal recycling dumpsters with lids | Keep dumpster lids closed when not in use. |
| 6 | Wood recycling dumpster without lid | Lidless dumpster to be replaced with dumpster with lid. |
| 7 | Garbage dumpster without lid | Lidless dumpster to be replaced with dumpster with lid. |
| 8 | Hydraulic pump oil leaks in shed next to trash compactor | Inspect shed and contents regularly. |
| 9 | Empty 55-gallon drums of Chevron lube oil, trace residue | Store drums under cover. |
| 10 | Close-up of oil sheen under galvanized tote | Monitor for sheens regularly and remove sources. |
| 11 | Empty scrap metal totes with metal dust and holes in bottom | Store tote under cover. |
| 12 | Steel plate storage area: zinc primer coated steel, mostly stored under canopy | Consider covering sides of the structure. |
| 13 | Various gas cylinders with corroding surfaces, flaking paint | Sweep the area frequently to remove paint flakes and dust; monitor cylinders for chipping and repair as necessary. |
| 14 | Empty 55-gallon drums with galvanized bolt and ring around lids | Store the drums under cover or more. |
| 15 | Hyster and Leavitt forklifts | To be stored under cover at the end of each day. |
| 16 | Leaking roof | Bid to be procured for re-roofing in 2013. |

# Kennedy/Jenks Consultants

32001 32nd Avenue South, Suite 100
Federal Way, Washington 98001
253-835-6400
FAX: 253-952-3435

## Enhanced Media Filtration
## Engineering Report

27 April 2012

Prepared for

### Trident Seafoods Corporation

401 Alexander Avenue, Building 592
Tacoma, Washington 98421

K/J Project No. 1296005.00

ATTACHMENT B

# TRIDENT SEAFOODS CORPORATION

## ENHANCED MEDIA FILTRATION

## ENGINEERING REPORT

**Prepared for:**

## TRIDENT SEAFOODS CORPORATION

401 Alexander Avenue, Building 592
Tacoma, Washington 98421

**Prepared by:**

**KENNEDY/JENKS CONSULTANTS**
32001 32nd Ave. South, Suite 100
Federal Way, WA 98001
(253) 835-6400

**27 April 2012**

**K/J 1296005.00**

# TABLE OF CONTENTS

PAGE
NUMBER

INTRODUCTION..................................................................................................I-1


ENGINEERING REPORT REQUIREMENTS

(2)(a) Type of industry or business ....................................................1

(2)(b) Kind and quantity of finished product .....................................1

(2)(c) The quantity and quality of water used by the industry and a
description of how it is consumed or disposed of........................2

    (i)   The quantity and quality of all process wastewater and
method of disposal..........................................................2

    (ii)  The quantity of domestic wastewater and how it is disposed of..........2

    (iii) The quantity and quality of noncontact cooling water
(including air conditioning) and how it is disposed of ...........................2

    (iv) The quantity of water consumed or lost to evaporation. ......................2


(2)(d) The amount and kind of chemicals used in the treatment
process, if any........................................................................2

(2)(e) The basic design data and sizing calculations of the treatment units .........3

(2)(f) A discussion of the suitability of the proposed site for the facility ...............5

(2)(g) A description of the treatment process and operation, including a
flow diagram........................................................................5

(2)(h) All necessary maps and layout sketches....................................5

(2)(i) Provisions for bypass, if any....................................................5

(2)(j) Physical provision for oil and hazardous material spill control or
accidental discharge prevention or both....................................6

(2)(k) Results to be expected from the treatment process including
the predicted wastewater characteristics, as shown in the
waste discharge permit, where applicable ..................................6

# TABLE OF CONTENTS

**PAGE NUMBER**

(2)(l)  A description of the receiving water, location of the point of
discharge, applicable water quality standards, and how
water quality standards will be met outside of any applicable
dilution zone ..................................................................................6

(2)(m) Detailed outfall analysis..............................................................8

(2)(n) The relationship to existing treatment facilities, if any................8

(2)(o) Where discharge is to a municipal sewerage system, a discussion
of that system's ability to transport and treat the proposed
industrial waste discharge without exceeding the municipality's
allocated industrial capacity. Also, a discussion on the effects of
the proposed industrial discharge on the use or disposal of
municipal sludge ..........................................................................8

(2)(p) Where discharge is through land application, including seepage
lagoons, irrigation, and subsurface disposal, a geohydrologic
evaluation of factors such as;.......................................................8

    (i)    Depth to groundwater and groundwater movement during
    different times of the year................................................8

    (ii)   Water balance analysis of the proposed discharge area ....................9

    (iii)  Overall effects of the proposed facility upon the groundwater in
    conjunction with any other land application facilities that may be
    present .........................................................................9

(2)(q) A statement expressing sound engineering justification through the use
of pilot plant data, results from other similar installations, or scientific
evidence from the literature, or both, that the effluent from the
proposed facility will meet applicable permit effluent limitations or
pretreatment standards or both ....................................................9

(2)(r) A discussion of the method of final sludge disposal and any
alternatives considered with reasons for rejection .......................9

(2)(s) A statement regarding who will own, operate, and maintain the system
after construction..........................................................................10

(2)(t) A statement regarding compliance with any state or local water
quality management plan or any plan adopted under the Federal
Water Pollution Control Act as amended....................................10

(2)(u) Provisions for any committed future plans..................................10

# TABLE OF CONTENTS

**PAGE NUMBER**

(2)(v)  A discussion of the various alternatives evaluated, if any, and
reasons they are unacceptable.................................................................... 10

(2)(w) A timetable for final design and construction............................................. 11

(2)(x)  A statement regarding compliance with the State Environmental
Policy Act (SEPA) and the National Environmental Policy Act
(NEPA), if applicable................................................................................. 11

(2)(y)  Additional items to be included in an engineering report for a solid
waste leachate treatment system are: ...................................................... 11

 (i) A vicinity map and also a site map that shows topography,
  location of utilities, and location of the leachate collection
  network, treatment systems, and disposal............................................ 11

 (ii) Discussion of the solid waste site, working areas, soil profile,
  rainfall data, and groundwater movement and usage......................... 12

 (iii) A statement of the capital costs and the annual operation
  and maintenance costs........................................................................ 12

 (iii) A description of all sources of water supply within two
  thousand feet of the proposed disposal site. Particular
  attention should be given to showing impact on usable or
  potentially usable aquifers ................................................................. 12

ENGINEERING OPINION ................................................................................... I

# TABLE OF CONTENTS

# APPENDICES

APPENDIX A        MAPS AND LAYOUTS

APPENDIX B        STORMWATER CHEMISTRY

APPENDIX C        SIZING CALCULATIONS AND DESIGN DATA

APPENDIX D        STORMWATERX ENHANCED MEDIA FILTRATION DATA

**Kennedy/Jenks Consultants**

# TRIDENT SEAFOODS CORPORATION

# ENHANCED MEDIA FILTRATION

# INTRODUCTION

Trident Seafoods Corporation's (Trident's) Port of Tacoma (Port) Facility (Facility) is an industrial repair facility located at 401 Alexander Avenue in Tacoma, Washington. The Facility conducts various activities including vessel repair, marine cargo handling, and general warehousing of supplies.

Stormwater discharges from the Facility are covered under the Washington State Department of Ecology (Ecology) Industrial Stormwater General Permit (ISGP) number WAR002508. The ISGP includes several requirements including sampling of stormwater discharges and comparison of analytical results to benchmarks listed in the ISGP. The permit includes an adaptive management process requiring facilities to improve stormwater best management practices (BMPs) and implement treatment of runoff if 3 or more quarterly samples are measured to contain contaminant concentrations exceeding benchmark levels in a calendar year (defined as Level 3). The Facility reached the Level 3 corrective action stage in 2010 for several of the ISGP listed parameters including total zinc and copper. Ecology issued Trident Administrative Order Docket #8762 on 28 September 2011 which includes a requirement to submit an Engineering Report for a permanent treatment system that meets the requirements of Washington Administrative Code (WAC) 173-240 for Ecology's review and approval by 1 May 2012.

This Engineering Report (Report) is being submitted as required by Administrative Order Docket #8762 and in accordance with Chapter 173-240-130 of the WAC. The Report is intended to provide sufficient information to allow for the design, construction, and operation of the proposed enhanced media filtration stormwater treatment devices to be discussed herein. The goal of the proposed treatment approach is to meet the benchmarks identified in the ISGP. StormwateRx Aquip Enhanced Stormwater Filtration Treatment (StormwateRx) has been selected as the proposed treatment solution for the

**Kennedy/Jenks Consultants**

Facility. As new stormwater treatment media are constantly being tested and introduced, Trident reserves the option to implement and experiment with alternative stormwater treatment media in the future to explore and implement the most applicable and effective treatment for runoff from the Facility's operations, pending successful results and full utilization of the proposed StormwateRx media. It is understood that Trident will continue to implement appropriate stormwater treatment with the goal of achieving the applicable benchmark values in future discharges, and that any potential future revisions to the Stormwater Pollution Prevention Plan (SWPPP) shall be based upon monitoring assessment or evaluation information to determine whether further modification of the Level 3 treatment BMPs or additional BMPs are necessary to meet the goal of achieving the applicable benchmark values in future discharges.

This Report has been organized to follow the same numbering and format as defined in WAC 173-240-130. Maps and layouts regarding the Facility's location and the proposed treatment approach are provided as figures in Appendix A. Historic stormwater sample analytical results from the Facility are provided in Appendix B. Sizing calculations and data pertaining to the proposed treatment approach are provided in Appendix C. StormwateRx data including an operation and maintenance manual, drawings, and performance data are provided in Appendix D.

**Kennedy/Jenks Consultants**

# TRIDENT SEAFOODS CORPORATION

## ENHANCED MEDIA FILTRATION
## ENGINEERING REPORT REQUIREMENTS

The purpose of this Engineering Report is to provide information required by Washington State Department of Ecology (Ecology) in accordance with Administrative Order Docket No. 8762. The information requirements of WAC 173-240-130 are as follows:

**(2)(a)    Type of industry or business.**

The Facility is an industrial repair facility conducting various activities including repair of fishing and fish tender vessels, marine cargo handling, and general warehousing of supplies. The following Standard Industrial Classifications (SIC) are applicable.

- 4424 – Deep Sea Domestic Transportation of Freight
- 4449 – Water Transportation of Freight, NEC
- 4491 – Marine Cargo Handling
- 3731 – Ship Building and Repairing
- 4225 – General Warehousing and Storage.

**(2)(b)    Kind and quantity of finished product.**

The Facility does not manufacture or produce finished products. Activities conducted at the Facility include repair of fishing and fish tender vessels, marine cargo handling, and general warehousing of supplies. Approximately 15 to 20 vessels are repaired at the Facility as necessary on an annual basis.

**Kennedy/Jenks Consultants**

**(2)(c)**  **The quantity and quality of water used by the industry and a description of how it is consumed or disposed of, including:**

**(i)**  **The quantity and quality of all process wastewater and method of disposal.**

Not applicable under the proposed scenario. No process wastewater is generated within the permitted area.

**(ii)**  **The quantity of domestic wastewater and how it is disposed of.**

Not applicable under the proposed scenario. All domestic wastewater is discharged to the City of Tacoma sanitary sewer system.

**(iii)**  **The quantity and quality of noncontact cooling water (including air conditioning) and how it is disposed of.**

Not applicable under the proposed scenario. No noncontact cooling water and no commercial air conditioning equipment are used within the permitted area.

**(iv)**  **The quantity of water consumed or lost to evaporation.**

Not applicable under the proposed scenario. No appreciable amount of water is consumed or lost to evaporation at the Facility.

**(2)(d)**  **The amount and kind of chemicals used in the treatment process, if any.**

No chemicals are used in the treatment process. Stormwater treatment is provided utilizing StormwateRx enhanced media filtration.

**Kennedy/Jenks Consultants**

**(2)(e)    The basic design data and sizing calculations of the treatment units.**

Ecology's Stormwater Management Manual for Western Washington (SWMM
February 2005) requires that Trident provide treatment facilities to be sized
based on calculation of the water quality (WQ) design flow rate. The Facility
drains two outfalls to the mouth of the Hylebos Waterway which is a flow
control exempt water body and as such, runoff detention facilities are not
required. Section 4.1.2 of Volume 5 of the SWMM defines the WQ design flow
rate when detention facilities are not required to be "the flow rate at or below
which 91% of the runoff volume, as estimated by an approved continuous
runoff model, will be treated."

The WQ design flow rate varies depending on a treatment facility's design and
if they are categorized as online or offline systems. The online WQ design flow
rate is used when all stormwater flows through a treatment device and it is
assumed that treatment effectiveness is reduced at higher flow rates. The
offline flow rate is used when flow splitting (bypass) devices are implemented
upstream of a treatment facility and higher flows bypass directly to the point of
compliance while treatment of the offline WQ design flow rate is maintained.
The stormwater treatment systems (systems) proposed for the Facility
incorporate lift stations with overflow weirs to allow flows in excess of the WQ
design flow rate to bypass treatment and be directly discharged to existing
outfalls. The treatment systems will continue to receive and treat the WQ
design flow rate to the applicable performance goal and only the higher
incremental portion of flow rates will be bypassed around the treatment
facilities. In accordance with Section 4.1.2 of Volume 5 of the SWMM, offline
WQ design flow rates were used for sizing of the treatment facilities. The
offline WQ design flow rates were calculated using Version 3 of the Ecology-
approved, continuous runoff model, Western Washington Hydrology Model
(WWHM3) applying data from the McMillin USGS Rainfall Station (nearest
station to the Facility).

The Facility consists of two separate drainage basins, Pier 24 and Pier 25
depicted on Figure 2 in Appendix A. Each contains their own respective
drainage system and outfall. The Pier 24 drainage basin encompasses

**Kennedy/Jenks Consultants**

2.45 acres of impervious area and generates an offline WQ design flow rate calculated by WWHM3 of 0.22 cubic feet per second (cfs). The Pier 25 drainage basin encompasses 6.54 acres of impervious area generating an offline WQ design flow rate of 0.59 cfs calculated by WWHM3.

Trident has conducted stormwater monitoring and sampling for Pier 24 and Pier 25 outfalls for a number of years. Recent monitoring data are included in Appendix B.

The proposed stormwater treatment systems incorporate enhanced media filtration using media provided by StormwateRx. The proposed systems will incorporate a lift station with overflow weir, influent, effluent and overflow piping, and a StormwateRx Aquip Enhanced Stormwater Filtration device for each drainage basin. Each filtration device shall be sized in accordance with Ecology's Conditional Use Level Designation (CULD) for Basic, Enhanced, and Phosphorous Treatment for StormwateRx, LLC, Aquip Enhanced Stormwater Filtration System dated July 2011. Ecology's CULD approves a hydraulic loading rate of no greater than 1 gallon per minute (gpm) per square foot (sf) of media surface area using StormwateRx enhanced (sorptive) media. Runoff will be pumped from locations downstream of existing oil/water separators to each StormwateRx filtration device via lift stations. Treated effluent will be routed back to the existing drainage systems and discharge to the existing outfalls. Flow rates exceeding the WQ design flow rate will bypass treatment and be directly discharged to the existing outfalls.

Based on the hydraulic loading rate of 1 gpm/sf of media surface area, the WQ design flow rate of 0.22 cfs for Pier 24's drainage basin requires a StormwateRx media surface area of no less than 99.37 sf. The WQ design flow rate of 0.59 cfs for Pier 25's drainage basin requires a StormwateRx media surface area of no less than 265.30 sf. Design data and system sizing calculations are presented in Appendix C.

**Kennedy/Jenks Consultants**

**(2)(f)** **A discussion of the suitability of the proposed site for the facility.**

Locations for installation of treatment facilities have been selected based on proximity to existing oil/water separators identified by Trident personnel as suitable locations providing limited impact to operations and ease of operation, maintenance, and inspection. Conceptual treatment system layout maps are provided in Appendix A.

**(2)(g)** **A description of the treatment process and operation, including a flow diagram.**

Each proposed treatment system will incorporate a lift station with overflow weir, influent, effluent, and overflow piping, and a StormwateRx Aquip Enhanced Stormwater Filtration device for each drainage basin. The lift station shall be installed within an existing storm drain manhole located downstream of existing settling chambers and oil/water separators receiving all of the runoff from each drainage basin. The existing downstream storm drain manholes shall be modified to accommodate pumps and overflow weirs. As runoff enters the proposed lift station with overflow weir, flow rates up to and including the WQ design flow rate will be conveyed to the StormwateRx Aquip Enhanced Stormwater Filtration device. Flow rates exceeding the WQ design flow rate will bypass treatment and be directly discharged to the existing outfalls. A typical process flow diagram of the proposed conveyance and treatment system is provided in Appendix A.

**(2)(h)** **All necessary maps and layout sketches.**

Maps and conceptual treatment system layout sketches are provided in Appendix A.

**(2)(i)** **Provisions for bypass, if any.**

Proposed lift stations and StormwateRx Aquip Enhanced Stormwater Filtration devices shall incorporate overflow weirs and/or piping as provisions for

**Kennedy/Jenks Consultants**

discharges beyond the WQ design flow rate.  Discharges beyond the WQ design flow rate will bypass treatment and be directly discharged to the existing outfalls.

**(2)(j)**   **Physical provision for oil and hazardous material spill control or accidental discharge prevention or both.**

Both Pier 24 and Pier 25 drainage basins were reconfigured and modified in the 1990s to include settling chambers and coalescing plate oil/water separators.  The proposed treatment systems will be installed downstream of these facilities.

**(2)(k)**   **Results to be expected from the treatment process including the predicted wastewater characteristics, as shown in the waste discharge permit, where applicable.**

The proposed StormwateRx treatment systems are intended to meet the stormwater discharge benchmarks identified in the ISGP.  The StormwateRx system has received a CULD by Ecology and has been proven to provide effective treatment for metals which are the primary contaminants of concern at the Facility.  Based on case studies for similar industrial facilities, post treatment runoff is anticipated to contain contaminant levels below ISGP benchmarks.  See Appendix D for StormwateRx literature and treatment and efficiency case studies.

**(2)(l)**   **A description of the receiving water, location of the point of discharge, applicable water quality standards, and how water quality standards will be met outside of any applicable dilution zone.**

- Description of the Receiving Water.

  The Facility is adjacent to the mouth of the Hylebos Waterway to the north and east.  The Pier 24 drainage basin discharges to mouth of the Hylebos Waterway thru an existing outfall located on the northern edge of the site.

**Kennedy/Jenks Consultants**

The Pier 25 drainage basin discharges to the mouth of the Hylebos
Waterway through an existing outfall located on the eastern edge of the
Facility, directly below the deck. Outfall locations are depicted on the site
figures included in Appendix A.

- Location of the Point of Discharge.

    The approximate coordinates of the Pier 24 discharge location are:
    - Latitude: N 47° 17' 00"
    - Longitude: W 122° 24' 35"

    The approximate coordinates of the Pier 25 discharge location are:
    - Latitude: N 47° 16' 55"
    - Longitude: W 122° 24' 25"

- Water Quality Standards.
    Water Quality Standards for Surface Waters of the State of Washington,
    WAC 173-201A, are applicable to the Facility's runoff.

- How Water Quality Standards will be Met Outside of Any Applicable
    Dilution Zone.

    No dilution zone has been defined for discharges from the Facility. Water
    quality standards are assumed to be met with the intent of achieving the
    benchmarks identified in the ISGP. As stated in ISGP Fact Sheet
    Condition S5.A&B and S8 – Benchmarks and Corrective Actions; *if the
    benchmark for a particular pollutant parameter is met, the discharge is
    presumed to not cause or contribute to a violation of water quality
    standards for that parameter.*

**Kennedy/Jenks Consultants**

**(2)(m)   Detailed outfall analysis.**

No outfall analysis is considered necessary as no outfall modifications are proposed and no dilution zone or mixing analysis are required or proposed. See Appendix A for layout maps of proposed systems.

**(2)(n)   The relationship to existing treatment facilities, if any.**

Existing settling chambers and oil/water separators will be incorporated with the proposed treatment systems as defined in Section 2(g) and shown on the site figures included in Appendix A.

**(2)(o)   Where discharge is to a municipal sewerage system, a discussion of that system's ability to transport and treat the proposed industrial waste discharge without exceeding the municipality's allocated industrial capacity.  Also, a discussion on the effects of the proposed industrial discharge on the use or disposal of municipal sludge.**

Not applicable.  Stormwater will not be discharged to a municipal sewerage system under the proposed scenario.

**(2)(p)   Where discharge is through land application, including seepage lagoons, irrigation, and subsurface disposal, a geologic evaluation of such factors as:**

Not applicable under the proposed scenario.

**(i)   Depth to groundwater and groundwater movement during different times of the year.**

Not applicable under the proposed scenario.

**Kennedy/Jenks Consultants**

   (ii)   Water balance analysis of the proposed discharge area.

        Not applicable under the proposed scenario.

   (iii)   Overall affects of the proposed facility upon the groundwater in conjunction with any other land application facilities that may be present.

        Not applicable under the proposed scenario.

**(2)(q)**   A statement expressing sound engineering justification through the use of pilot plant data, results from other similar installations, or scientific evidence from the literature, or both, that the effluent from the proposed facility will meet applicable permit effluent limitations or pretreatment standards or both.

        The proposed StormwateRx treatment systems are intended to meet the stormwater discharge benchmarks identified in the ISGP. The StormwateRx system has received a CULD by Ecology and has been proven to provide effective treatment for metals which are the primary contaminants of concern at the Facility. Based on case studies for similar industrial facilities, post treatment runoff is anticipated to contain contaminant levels below ISGP benchmarks. See Appendix D for StormwateRx literature and treatment and efficiency case studies. In Kennedy/Jenks Consultants' professional opinion using sound engineering judgment, the proposed treatment scenario is projected to provide runoff treatment in accordance with Section S8.D of the ISGP.

**(2)(r)**   A discussion of the method of final sludge disposal selected and any alternatives considered with reasons for rejection.

        The StormwateRx Aquip Enhanced Stormwater Filtration media will require periodic replacement with spent media regenerated or disposed to a Subtitle D

**Kennedy/Jenks Consultants**

non-hazardous waste landfill.  No sludge will be generated under the proposed system.

**(2)(s)**   **A statement as to who will own, operate, and maintain the system after construction.**

The systems will be owned by Trident and operated and maintained by Trident personnel.

**(2)(t)**   **A statement regarding compliance with any state or local water quality management plan or any plan adopted under the Federal Water Pollution Control Act as amended.**

The Facility's stormwater treatment systems will be operated in accordance with ISGP number WAR002508 and in conjunction and combination with other applicable BMPs included in the Facility's SWPPP.

**(2)(u)**   **Provisions for any committed future plans.**

Trident has no committed future plans for major modifications to the Facility that would require modification of the proposed systems.

**(2)(v)**   **A discussion of the various alternatives evaluated, if any, and reasons they are unacceptable.**

Americast Filterra® Enhanced Treatment and StormwateRx Aquip Enhanced Stormwater Filtration Treatment were both evaluated and considered appropriate stormwater treatment solutions.  Ecology has issued Use Level Designations for both Filterra and StormwateRx, each with their own conditions of use defining approved hydraulic loading rates and sizing requirements. StormwateRx was ultimately selected based on evaluation of the required footprints necessary for each system and projected operation and maintenance

**Kennedy/Jenks Consultants**

costs. Filterra treatment systems ultimately required a larger footprint not feasible for the Facility's operations and work activity.

**(2)(w)   A timetable for final design and construction.**

Final design of the systems utilizing StormwateRx Aquip Enhanced Stormwater Filtration media will be completed following approval of this Engineering Report. As required by Administrative Order #8762, the construction of the systems will be completed no later than 30 September 2012. This timetable is considered appropriate provided that Trident receives timely approval of this Engineering Report allowing adequate time necessary for design and project permitting and construction.

**(2)(x)   A statement regarding compliance with the State Environmental Policy Act (SEPA) and the National Environmental Policy Act (NEPA), if applicable.**

Compliance with SEPA and NEPA are not considered to be applicable for this project.

**(2)(y)   Additional items to be included in an engineering report for a solid waste leachate treatment system are:**

**(i)    A vicinity map and also a site map that shows topography, location of utilities, and location of the leachate collection network, treatment systems, and disposal;**

Not applicable under the proposed scenario though location and site layout maps are included in Appendix A.

(ii)   Discussion of the solid waste site, working areas, soil profile, rainfall
        data, and groundwater movement and usage;

Not applicable under the proposed scenario.

(iii)   A statement of the capital costs and the annual operation and
        maintenance costs;

Not applicable under the proposed scenario.

(iv)   A description of all sources of water supply within two thousand feet of
        the proposed disposal site. Particular attention should be given to
        showing impact on usable or potentially usable aquifers.

Not applicable under the proposed scenario.

**Kennedy/Jenks Consultants**

In Kennedy/Jenks Consultants' professional judgment and per the standard of care, the
Enhanced Media Filtration system proposed herein meets the requirements of
Section S8.D of the Industrial Stormwater General Permit and the preceding
Engineering Report meets the requirements defined in Administrative Order
Docket #8762 and WAC 173-240-130.

**Kennedy/Jenks Consultants, Inc.**

Ben Fuentes, P.E.
Project Manager

Ross Dunning, P.E.
Senior Engineer



ATTACHMENT C

# THE ROSE FOUNDATION
For Communities & the Environment

9/18/12

Thomas W. Swegle, Senior Counsel
US Department of Justice
Environment & Natural Resources Division
Law and Policy Section
P.O. Box 7415
Ben Franklin Station
Washington, D.C. 20044-7415

Re:  Puget Soundkeeper Alliance v. Trident Seafoods Tacoma, Case No. 11-5811BHS

Dear Mr. Swegle,

This letter is intended to provide assurance that I have received the proposed Consent Decree between the Puget Soundkeeper Alliance and Trident Seafoods Tacoma, and that I am authorized by my Board of Directors to make the following binding commitments on behalf of the Rose Foundation.

1) I understand that the Rose Foundation should receive funds from Trident Seafoods Tacoma as specified in the Consent Decree.

2) The Rose Foundation shall only use these funds to award grants to qualified organizations in support of projects designed to improve the water quality of Puget Sound in the Tacoma area. In selecting projects, the Rose Foundation shall give preference to projects located in, or otherwise benefiting Commencement Bay. The funds shall be disbursed through the Rose Foundation's Puget Sound Stewardship & Mitigation Fund, a grantmaking fund which is wholly dedicated to supporting projects which benefit the water quality of Puget Sound. None of the funds shall be used to support political lobbying.

3) After all the funds have been disbursed, the Rose Foundation shall send a report to the Justice Department, the court and the parties describing how the funds were utilized and demonstrating conformance with the nexus of the Consent Decree.

**Rose Foundation for Communities and the Environment**
The Rose Foundation is a 501(c)(3) public charity (tax ID#94-3179772). Its mission is to support grassroots initiatives to inspire community action to protect the environment, consumers and public health. To fulfill this mission, the Rose Foundation conducts the following activities:

- Raise money to award as grants to qualified non-profit organizations conducting charitable operations.

6008 College Avenue, Suite 10 • Oakland, CA • 94618

(510) 658-0702 • (510) 658-0732 • rose@rosefdn.org • www.rosefdn.org

- Work directly in schools and in the community to encourage environmental stewardship and civic participation.

- Help government efforts to control pollution and protect the environment by encouraging community engagement in local, state and federal research and policy development.

Within this broad range of activities, all of the Rose Foundation's work revolves around one or more of the following strategic themes:

- Build and maintain a bridge between the community and organized philanthropy.

- Protect the natural environment, public health, and community and consumer rights.

- Promote collaboration between labor, environmental, business, consumer and social interests.

- Cultivate a new generation of environmental stewards and social policy leaders.

- Respect the inalienable rights protected by our nation's constitution, and the essential human rights to clean air, clean water, and individual dignity and privacy.

The Rose Foundation is governed by a Board of Directors. Grant applicants are required to submit written proposals, which must include at a minimum specific information about the goals, activities and projected outcomes of the proposed project, background about the charitable applicant, budget information, and a specific funding request. The Foundation may require additional information in order to fully evaluate the application. Applications are first screened by Foundation staff. Staff then makes recommendations to the Foundation Board for action. The Foundation requires all projects to submit written reports within one year of receipt of the grant award describing work conducted under the grant, thereby providing an accountability mechanism over funds awarded. Annual audits by the certified public accounting firm Levy and Powers are posted on the Foundation's website www.rosefdn.org.

I hope this provides you with the information you require. Please do not hesitate to contact me with any questions, or for additional information at (510) 658-0702 or tlittle@rosefdn.org.

Sincerely,

Tim Little
Executive Director

2